No. 05-019

IN THE SUPREME COURT OF THE STATE OF MONTANA

2006 MT 218

YELLOWSTONE COUNTY,

Plaintiff and Respondent,

v.

BILLINGS GAZETTE, a division of LEE ENTERPRISES,
L. SANFORD SELVEY II, and SARAH D. SCHOPFER,

Defendants and Appellants.

APPEAL FROM:     The District Court of the Thirteenth Judicial District,
                 In and For the County of Yellowstone, Cause No. DV 2003-0180,
                 Honorable G. Todd Baugh, Presiding Judge

COUNSEL OF RECORD:

        For Appellants:

            Martha Sheehy, Sheehy Law Firm, Billings, Montana

        For Respondent:

            Calvin J. Stacey, Stacey & Funyak, Billings, Montana

                                Submitted on Briefs:  October 5, 2005

                                        Decided:  September 6, 2006

Filed:

        _____
                            Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1 The Billings Gazette (Gazette) sought access to public documents held by Yellowstone County (County) concerning civil litigation brought against the County and county officials. The County filed a declaratory action in the District Court seeking a determination of which documents must be disclosed to the Gazette, and which documents should be shielded from public inspection in the interest of individual privacy. The District Court determined that all documents requested by the Gazette should be disclosed with some redactions, and denied the Gazette's request for costs and attorney fees. On appeal the Gazette seeks (1) access to the redacted portions of the Interim Chief Public Defender's deposition, and (2) costs and attorney fees. We reverse and remand.

## ISSUES

¶2 The issues on appeal are:

1. Whether Montana's constitutional right to know gives the Gazette a right to inspect the entirety of the Interim Chief Public Defender's deposition testimony.

2. Whether the Gazette should receive costs and attorney fees for enforcing the public's right to know.

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 Various lawsuits brought against the County concerning the operation of Yellowstone County's Public Defenders Office (Office) spawned the dispute now before us. The facts underlying those cases are not at issue here, but are essential to understanding the case we now consider.

2

¶4 Yellowstone County's Chief Public Defender, Sanford Selvey II (Selvey), resigned due in part to misconduct by Selvey toward Sarah Schopfer (Schopfer), an investigator who worked in the Office. Roberta Drew (Drew), then-Deputy Chief Defender, applied to be Interim Chief Defender, but the County hired Curtis Bevolden (Bevolden) instead. Bevolden later fired Drew. Consequently Drew initiated an internal County grievance proceeding which culminated in her reinstatement as Deputy Chief Public Defender. Drew then filed a human rights complaint against the County, and also a federal discrimination suit against the County, Bevolden, and three other county officials not involved in this appeal.

¶5 The Gazette, a newspaper based in Billings, Montana, reported on the complaints filed by Schopfer and Drew and the ensuing litigation as it developed. Accordingly, the Gazette served the County with several Freedom of Information Act requests seeking documentation related to the County's management of the Office and the expenditure of public funds for purposes of resolving Schopfer's and Drew's claims against county officials and employees. On February 6, 2003, the Gazette requested from the County copies of all public records documenting Selvey's, Schopfer's, and Drew's "classification, status, salary, hire date, promotion, adverse actions, and formal complaints," in addition to "records of employee evaluations."

¶6 In response, on February 18, 2003, the County filed the declaratory judgment action which led to this appeal. In its complaint, the County named the Gazette, Selvey, Schopfer, and Drew as defendants and asked the District Court to "balance the public's right to know and to examine public documents with the right of privacy maintained by the three individual

3

defendants and determine, what if any documentation in the possession of [the County], should be given to the Billings Gazette." For the next 18 months, the County took no action in the District Court to resolve its claim except to dismiss Drew as a defendant. Meanwhile, the Gazette continued to actively pursue production of the disputed documents and resolution of the conflict underlying the County's declaratory action.

¶7 Pending resolution of the County's claim, informal negotiations among the parties ensued. Drew and Selvey voluntarily provided their personnel files to the Gazette and the County produced several non-sensitive documents. Then, the Gazette learned that Bevolden and several other County officials had been deposed by the County during discovery in Drew's federal discrimination suit. The Gazette asked for copies of the deposition transcripts.

¶8 The Gazette first requested copies of Bevolden's transcripts on September 24, 2003. On October 24, 2003, County's counsel wrote to the Gazette's attorney, "Please be advised that I am having the depositions of . . . Mr. Bevolden . . . [and others] copied at the present time and I will be sending you the transcripts shortly." On November 18, 2003, however, the County reversed course and informed the Gazette the depositions would not be produced. Drew objected to disclosure of some of the requested deposition transcripts due to Drew's and her clients' privacy interests. No objection was raised to disclosure of Bevolden's deposition. The Gazette maintained that Drew's objection had no legal bearing on the County's obligation to produce the requested documents.

4

¶9    The Gazette filed a Motion to Compel on January 14, 2004, as the depositions had not been produced. The proceeding was then briefly delayed for lack of a judge to hear the case. Then, the Gazette claims that at a scheduling conference in the District Court on March 17, 2004, the County again committed to provide copies of the depositions still in dispute, but then again reneged on that commitment. The County does not deny having agreed to produce the transcripts, but explains that each time deposition transcripts were about to be produced Drew, Selvey, and/or Schopfer threatened to sue the County for violation of their privacy rights.

¶10    Nearly eight months later, on August 6, 2004, the County produced redacted copies of Bevolden's deposition less than an hour before the District Court's hearing on the Gazette's Motion to Compel. The District Court had not previously reviewed Bevolden's deposition or any of the other depositions subject to the Motion, nor had it approved any redactions from the transcript.

¶11    On November 5, 2004, the District Court granted the Gazette's Motion to Compel and ordered the County to produce in full all of the documents still in dispute "excepting only the . . . portions wherein the individual right of privacy of non-parties outweighs the public right to know . . . ." The District Court authorized redactions of five pages from Bevolden's deposition testimony given in Drew's federal discrimination case against Bevolden for Drew's wrongful termination as Chief Deputy Public Defender. The District Court further ordered the parties to pay their own attorney fees. The District Court made no findings of fact to support its Order.

5

¶12 The Gazette appeals from the District Court's authorization of redactions from Bevolden's deposition testimony, and from denial of the Gazette's request for attorney fees.

## STANDARD OF REVIEW

¶13 We review a district court's conclusion of law regarding a constitutional question to determine whether it is correct. *Bryan v. District,* 2002 MT 264, ¶ 16, 312 Mont. 257, ¶ 16, 60 P.3d 381, ¶ 16.

¶14 An award of attorney fees is discretionary, and therefore a district court's denial of attorney fees is reviewed for an abuse of discretion. *Investigative Records of City of Columbus Pol. Dept.* (1995), 272 Mont. 486, 488, 901 P.2d 565, 566-67.

## DISCUSSION

## ISSUE ONE

¶15 *1. Whether the public has a right to inspect the entirety of the Interim Chief Public Defender's deposition testimony.*

¶16 On appeal the Gazette objects to the District Court's determinations regarding only one contested deposition, that of Interim Chief Public Defender Bevolden. In reviewing the District Court's authorization of redactions from Bevolden's deposition, we must decide (1) whether Bevolden has a privacy interest in his own deposition testimony which clearly outweighs the public's right to be informed of all of the deposition's contents, and (2) whether the non-party individuals discussed by Bevolden in his deposition have privacy interests which prevent public disclosure of the deposition's contents.

¶17 The Montana Constitution at Article II, Section 9 grants the public's right to know:

> Section 9. **Right to know.** No person shall be deprived of the right to examine documents or to observe the deliberations of all public bodies or agencies of state government and its subdivisions, except in cases in which the demand of individual privacy clearly exceeds the merits of public disclosure.

Corresponding statutes protect public access to government documents, including § 2-6-102(1), MCA, which provides, "Every citizen has a right to inspect and take a copy of any public writing of this state . . . ." We have previously concluded that the rights granted by the right to know provision extends not only to individuals, but also to media entities. *Jefferson County v. Montana Standard,* 2003 MT 304, ¶ 13, 318 Mont. 173, ¶ 13, 79 P.3d 805, ¶ 13 (citation omitted).

¶18 As stated in *Becky v. Butte-Silver Bow Sch. Dist. 1* (1995), 274 Mont. 131, 136, 906 P.2d 193, 196, and reiterated in *Bryan*, ¶ 33:

> Any review of Article II, Section 9, of the Montana Constitution necessarily involves a three-step process. First, we consider whether the provision applies to the particular political subdivision against whom enforcement is sought. Second, we determine whether the documents in question are "documents of public bodies" subject to public inspection. Finally, if the first two requirements are satisfied, we decide whether a privacy interest is present, and if so, whether the demand of individual privacy clearly exceeds the merits of public disclosure.

In the instant case, the County does not dispute that it is a political subdivision against which the right to know provision is enforceable. Neither does the County contest that Bevolden's deposition is a document of a public body subject to public inspection. As such, we turn our discussion to the final steps of the right to know test to determine (1) whether privacy interests are present, and (2) if so whether the demand for individual privacy clearly exceeds the merits of public disclosure.

¶19 It is well established that Montana's constitutional right to know is not absolute. *See Jefferson*, ¶ 13, citing *Bozeman Daily Chronicle v. Police Dept.* (1993)*, 260 Mont. 218, 224, 859 P.2d 435, 439, and *In re Lacy* (1989), 239 Mont. 321, 325, 780 P.2d 186, 188. Public disclosure is not required in cases where the demand for individual privacy clearly exceeds the public's right to know. *Bryan,* ¶ 33. The text of Montana's constitutional right to know provision is directly followed by the individual privacy right, found at Article II, Section 10 of the Montana Constitution, which provides:

> Section 10. **Right of privacy.** The right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest.

¶20 Determining whether public disclosure is required demands a balancing of the public's right to know with competing privacy interests "in the context of the facts of each case . . . ." *Associated Press, Inc. v. Department,* 2000 MT 160, ¶ 24, 300 Mont. 233, ¶ 24, 4 P.3d 5, ¶ 24, quoting *Missoulian v. Board of Regents of Higher Educ.* (1984), 207 Mont. 513, 529, 675 P.2d 962, 971. To determine whether an individual has a protected privacy interest under Article II, Section 10, of the Montana Constitution we apply a two-part test. *Jefferson County*, ¶ 15 (citation omitted). A constitutionally protected privacy interest exists when a person has a subjective or actual expectation of privacy that society is willing to recognize as reasonable. *Lincoln County Com'n v. Nixon,* 1998 MT 298, ¶ 16, 292 Mont. 42, ¶ 16, 968 P.2d 1141, ¶ 16 (citation omitted).

¶21 In this case, we first must determine whether Bevolden has a constitutionally protected privacy interest in the transcript of his deposition which society is willing to recognize as

reasonable.  We have previously determined that society is not willing to recognize as reasonable the privacy interest of individuals who hold positions of public trust when the information sought bears on that individual's ability to perform public duties.  *See Great Falls Tribune v. Sherriff* (1989), 238 Mont. 103, 107, 775 P.2d 1267, 1269 (the public's right to know outweighed the privacy interests of three disciplined police officers in the public release of their names because police officers hold positions of "great public trust"); *Bozeman Daily Chronicle,* 260 Mont. at 227, 859 P.2d at 440-41 (investigative documents associated with allegations of sexual intercourse without consent by an off-duty police officer were proper matters for public scrutiny because "such alleged misconduct went directly to the police officer's breach of his position of public trust . . ."); and *Svaldi v. Anaconda-Deer Lodge County,* 2005 MT 17, ¶ 31, 325 Mont. 365, ¶ 31, 106 P.3d 548, ¶ 31 (a public school teacher entrusted with the care and instruction of children held a position of public trust and therefore the public had a right to view records from an investigation into the teacher's abuse of students).

¶22    Public defenders, as the officers of our courts charged with safeguarding the public's fundamental constitutional rights to counsel and a fair and speedy trial, play an essential role in preserving public confidence in our judicial system and preserving these rights for every member of society.  As Interim Chief Public Defender for Yellowstone County, Bevolden held a position of public trust.  He was employed by the County and paid with public funds to provide effective legal counsel to indigent persons charged with crimes, and to direct and manage the Office in a manner conducive to ensuring that attorneys under his supervision

9

also provided effective counsel to clients. Consequently, Bevolden's subjective expectation of privacy was diminished as to matters involving his performance of official duties as Interim Chief Public Defender. Moreover, there is no evidence in the record to suggest that Bevolden actively asserted a privacy interest in his deposition transcript.

¶23 We determine, after reviewing unedited copies of Bevolden's deposition, that the information contained in the redacted portions bears directly on Bevolden's professional judgment, the management decisions he made as Interim Chief Public Defender, and his official conduct. Therefore, the public's right to access Bevolden's deposition clearly outweighs any privacy interest he might otherwise assert in this material.

¶24 Next, we turn to the question of whether the non-party individuals discussed by Bevolden in his deposition have protected privacy interests in the portions of Bevolden's testimony redacted by the District Court. Again we apply the privacy test to determine whether the public's right to know clearly outweighs reasonable expectations of privacy that non-parties might have in Bevolden's testimony. The Gazette argues that the County raises for the first time on appeal the privacy interests of non-party individuals. However, on review of the August 6, 2004 hearing transcript, we conclude that the County made arguments in the District Court which can reasonably be interpreted as asserting the privacy interests of non-parties. Also, we note that the Gazette agreed in the District Court, and has again agreed on appeal, to redaction of the names of non-parties in the interest of their privacy. We agree that redacting the names of non-parties from Bevolden's deposition is

10

appropriate here. However, further redactions shielding more than the names of non-parties are not warranted.

¶25 We have previously determined that redacting individuals' names from public records sufficiently protects their privacy, while still allowing disclosure of relevant public information, even in the context of criminal parole files. *See Worden v. Montana Bd. of Pardons and Parole,* 1998 MT 168, ¶ 29, 289 Mont. 459, ¶ 29, 962 P.2d 1157, ¶ 29 (omitting from parole files the names and addresses of letter writers protected privacy sufficiently to allow the public to view contents of letters). We have also interpreted the right to know as permitting access to the "widest breadth of information possible," even where the individuals whose privacy interests were implicated did not work in the public realm. *See Lincoln County Com'n*, ¶ 21, discussing *In re Lacy,* 239 Mont. 321, 780 P.2d 186 (insurance company invoked the right to know to gain access to medical records of deceased insured held by the government).

¶26 The redacted portions of Bevolden's deposition clarify what Bevolden knew about the non-parties' work history and illuminate Bevolden's decision to hire them instead of Drew. Bevolden's hiring decisions, in light of his prior knowledge of the non-parties' job performance, were among the reasons Drew sued Bevolden and the County for discrimination. Bevolden's testimony therefore goes directly to Drew's claims. Notably, neither of the non-parties here asserted on their own behalf a privacy interest in Bevolden's testimony. Additionally, both of the non-parties named by Bevolden were public defender attorneys employed by the County and paid with public funds to represent indigent criminal

11

defendants.  It bears emphasis that even public employees in positions of public trust retain privacy interests in their personal information and conduct unrelated to their job performance.  However, our inspection of Bevolden's deposition reveals that his discussion about non-parties was limited to his knowledge of those non-parties' job history and performance of official duties.

¶27    We conclude that on the facts presented here the public's right to know about Bevolden's management of the Office and the quality of representation afforded by the Office under Bevolden's direction clearly outweighs any privacy interest non-parties may have in the redacted portions of Bevolden's testimony.  Therefore, the public has a right to inspect the entirety of Bevolden's deposition so long as the names of the non-parties are withheld.

## ISSUE TWO

¶28    *2.  Whether the Gazette should receive costs and attorney fees for enforcing the public's right to know.*

¶29    The Gazette appeals from the District Court's denial of its request for attorney fees, claiming that the County's conduct unnecessarily delayed access to public documents, thereby justifying an award of fees and costs.  It further argues that the District Court abused its discretion when it failed to articulate in its Order its reasons for denying the Gazette an award of fees, and because the District Court has in essence allowed the County to misuse its court action without consequence.  In response, the County argues that the District Court has the discretion to grant or deny an award of attorney fees and that the court did not abuse its

12

discretion given the many reasons why it took eighteen months to resolve the disputes presented here.

¶30 We agree that an award of attorney fees is discretionary. *See Matter of Investigative Records* (1994), 265 Mont. 379, 382, 877 P.2d 470, 472 (where we reviewed the legislative history leading to the adoption of § 2-3-221, MCA, and concluded that "the clear intent of the statute is that an award of attorney's fees is discretionary" and accordingly does not mandate attorney fee awards for prevailing parties in suits brought under Article II, Section 9 of the Montana Constitution). However, it is well-established that outright denial of a motion for attorney fees without rationale, is "not an exercise of discretion, but is an abuse of that discretion." *Matter of Investigative Records,* 265 Mont. at 383, 877 P.2d at 472, citing *Gursky v. Parkside Professional Village* (1993), 258 Mont. 148, 152, 852 P.2d 569, 571. Moreover, we have previously held that due to the "public benefits gained" by the vindication of the public's right to know, the costs of litigation to secure these rights should be spread among beneficiaries. *Associated Press, Inc.,* ¶ 43.

¶31 We conclude that the District Court erred in denying the Gazette's motion for attorney fees without rationale. *Matter of Investigative Records,* 265 Mont. at 383, 877 P.2d at 472. Further, we hold that the District Court's discretion to deny attorney fees in right to know cases is not unfettered. Accordingly, we remand to the District Court for reconsideration of the Gazette's motion for attorney fees in light of the discussion set forth above.

## CONCLUSION

¶32 For the foregoing reasons, we reverse the District Court's authorization of redactions which eliminate more than non-party names from Bevolden's deposition testimony, and reverse and remand for further consideration of the Gazette's request for attorney fees and entry of an order thereon with supporting rationale.

/S/ PATRICIA COTTER

We Concur:

/S/ JAMES C. NELSON
/S/ JOHN WARNER
/S/ BRIAN MORRIS
/S/ JIM RICE

Justice James C. Nelson concurs.

¶33 I concur in our decision. I write separately to state my agreement with the Gazette that we should hold that the District Court's discretion to deny attorney fees in right-to-know cases is not unfettered. Indeed, while discretionary, the award of attorney fees in right-to-know cases should be presumed, for the reasons set forth below.

¶34 The Gazette argues that the following factors must be taken into consideration in ruling on a fee request. This Court does not address these factors, presumably because the suggestion that we adopt them was raised in the Gazette's reply brief.

¶35 Nonetheless, I agree that these factors should be part of the District Court's calculus in determining whether to grant attorney fees in a right-to-know case. Specifically, the court should consider:

1. whether the governmental entity has produced undisputed portions of the requested materials;

2. whether the government has acted expeditiously to bring the dispute to resolution, including the provision of documents *in camera* for the district court's analysis;

3. whether the government has timely produced a production log detailing its objections to production;

4. the delay involved;

5. the extent to which the government's action in filing a declaratory judgment action is a pre-textual act designed to avoid timely production of the documents rather than an attempt to resolve legitimate disputes concerning privacy interests;

6. the extent to which privacy interests have been actually asserted by the affected parties; and

7. the good faith of government officials in complying with the statutory and constitutional requirements of public inspection.

15

¶36     There should be a presumption of awarding attorney fees to the prevailing plaintiff in right-to-know cases, and the process of making that award should be informed by use of the above standards for the following reasons.

¶37     The right-to-know guarantees of Article II, Section 9, of the Montana Constitution,[1] are among the most important guarantees that Montanans enjoy.  As this right is contained in the Constitution's Declaration of Rights, it is a fundamental right.  *State v. Tapson*, 2001 MT 292, ¶ 15, 307 Mont. 428, ¶ 15, 41 P.3d 305, ¶ 15.  In interpreting this provision, we have held that there is a constitutional presumption that all documents of every kind in the hands of public officials are amenable to inspection.  *Great Falls Tribune v. Mont. Public Service Comm'n*, 2003 MT 359, ¶ 54, 319 Mont. 38, ¶ 54, 82 P.3d 876, ¶ 54.

¶38     Additionally, we have held that this right to examine government documents, together with the public's right of participation as provided for in Article II, Section 8,[2] imposes "an 'affirmative' duty on government officials to make all of their records and proceedings available to public scrutiny."  *Great Falls Tribune*, ¶ 54.  Specifically, we stated:

> In effect, Article II, Sections 8 and 9, of the 1972 Montana Constitution impose an "affirmative" duty on government officials to make all of their records and proceedings available to public scrutiny.  Consequently,
>
> > there is a *constitutional presumption* that all documents of every kind in the hands of public officials are amenable to inspection,

---

[1] Article II, Section 9, provides:  "**Right to Know.**  No person shall be deprived of the right to examine documents or to observe the deliberations of all public bodies or agencies of state government and its subdivisions, except in cases in which the demand of individual privacy clearly exceeds the merits of public disclosure."

[2] Article II, Section 8, provides:  "**Right of participation.**  The public has the right to expect governmental agencies to afford such reasonable opportunity for citizen participation in the operation of the agencies prior to the final decision as may be provided by law."

16

> regardless of legislation, special exceptions made to accommodate the exercise of constitutional police power, and other competing constitutional interests, such as due process.

[*Associated Press, Inc. v. Department*, 2000 MT 160, ¶ 85, 300 Mont. 233, ¶ 85, 4 P.3d 5, ¶ 85] (Nelson, J., specially concurring) (quoting *Belth v. Bennett* (1987), 227 Mont. 341, 344, 740 P.2d 638, 640) (emphasis added). Leaving to the public the duty to initiate the challenge of confidentiality of particular documents filed by [the Montana Power Company ("MPC")] with the [Montana Public Service Commission ("PSC")] under a "generic" protective order abrogates the PSC's affirmative duty to make all of its records available to the public in the absence of *specific findings by the PSC* that the documents represented by MPC to constitute trade secrets or confidential proprietary information are indeed property interests which require constitutional due process protections.

> Consequently, to the extent the PSC's current procedural rules and/or common practices rely on mere representations of public utilities that the information contains trade secrets or other confidential proprietary information which warrants protection of a PSC order and/or application of other protective measures, the PSC has unconstitutionally shifted the initial burden of proof to the public to challenge a public utility's claims of confidentiality. Thus, this creates a presumption of confidentiality which directly conflicts with the constitutional presumption of the public's right to view all public records and of the PSC's correlating constitutional affirmative duty to make its records and proceedings readily available to the public in the first instance.

*Great Falls Tribune*, ¶¶ 54-55.

¶39    Moreover, taking both the right to participate and the right to know together, we have stated as follows:

> "Both [Section 8 and Section 9 of Article II] arise out of the increasing concern of citizens and commentators alike that government's sheer bigness threatens the effective exercise of citizenship. The [Bill of Rights] committee notes this concern and believes that one step which can be taken to change this situation is to Constitutionally presume the openness of government documents and operations."

*Bryan v. Yellowstone County School District*, 2002 MT 264, ¶ 31, 312 Mont. 257, ¶ 31, 60 P.3d 381, ¶ 31 (quoting Montana Constitutional Convention, Vol. II, Bill of Rights Committee Proposal, February 23, 1972, p. 631). Thus, in adopting Article II, Sections 8 and

17

9, the framers of Montana's Constitution envisioned a transparent government—one in which the public was guaranteed coordinate rights to examine public documents and deliberations of public bodies at all levels of government and to participate in the operations and final decision-making of the government's agencies.

¶40 Indeed, while the right to know may not, in all circumstances, be "absolute," there is little doubt that, in cases where it is properly invoked, it is a right that is, at a minimum, equal to, and in most cases superior to, the right of individual privacy. In one respect, the right to know and the right of individual privacy are both on equal footing—they are both fundamental rights contained in Article II. However, in the context of right-to-know cases where the right of privacy is an issue, the right to know is most certainly superior. Article II, Section 9, states that no person shall be deprived of the right to examine documents "*except in cases in which the demand of individual privacy *clearly exceeds* the merits of public disclosure*" (emphasis added).

> This plain and unambiguous language means that when the balance is even, the right to know trumps, thus requiring disclosure. In fact, even if the balance is slightly in favor of individual privacy, the right to know still trumps, thus requiring disclosure. It is *only* when the balance is *clearly* in favor of individual privacy that the documents may be properly withheld from the public. It is at this stage, and this stage only, that the right to individual privacy trumps the right to know.

*Havre Daily News, LLC, v. City of Havre*, 2006 MT 215, ¶ 69, ____ Mont. ____, ¶ 69, ____ P.3d ____, ¶ 69 (Nelson, J., concurring and dissenting).

¶41 The plain language of the Constitution requires that disclosure is the rule, and withholding public documents and information based on individual privacy is the exception.

18

The term "except"[3] in Section 9 necessarily makes withholding information based on privacy the exception under elemental rules of statutory interpretation. Thus, the right to know is indeed superior in the sense that it *presumptively trumps* the right to individual privacy in these contexts.

¶42    And, if this plain language is not clear enough, the transcripts of the Constitutional Convention make it unquestionable. As the venerable Delegate Dorothy Eck stated, with regard to Section 9, "we added the word 'clearly' with the intention of *tipping the balance* in the favor of the right to know." Montana Constitutional Convention, Verbatim Transcript, March 7, 1972, p. 1670 (emphasis added). How much more clear can it be? The balance is *tipped in favor* of the right to know—that, indeed, makes this right presumptively superior to the right of individual privacy in right-to-know cases where the two rights are in tension.

¶43    In this regard the framers of Montana's Article II, Section 9, were uncannily foresighted. In December 2005, the *New York Times* reported that the National Security Agency ("NSA") had been conducting a covert, warrantless program of monitoring international telephone calls and e-mails of thousands of persons suspected of links with terrorist organizations.[4] Then, in May 2006, another national newspaper, *USA Today*, broke the story that the NSA had been secretly collecting the phone call records of tens of millions of Americans using data provided by phone companies—these not limited to international

---

[3] The word "except" means "with the exclusion or exception of," "to take or leave out," and "on any other condition than that." *Merriam Webster's Collegiate Dictionary* 403 (10th ed., 1997).

[4] James Risen & Eric Lichtblau, *Bush Lets U.S. Spy on Callers Without Courts*, N.Y. Times A1 (Dec. 16, 2005).

calls, but including domestic calls made by ordinary Americans.[5] This sort of "data mining" has also been conducted on confidential financial information.[6] One federal court has ruled that some of these activities have been conducted in violation of the federal constitution.[7] Aside from these observations, it is not my purpose here to comment on these matters further, other than to point out the following.

¶44 The protection of our constitutional rights is in many cases dependent upon a vigorous and free press and an independent judiciary passionately committed to the rule of law and to the supremacy of the Constitution. The right of individual privacy is a case in point. As demonstrated by the foregoing references to the federal government's secretive and warrantless data mining of personal information, the integrity and vitality of the right of privacy may well depend solely upon the individual's ability to learn that his or her right has been violated. Indeed, in Montana, protection of the right of individual privacy may well rise and fall on the ability of the press to demand and then disclose public documents under Article II, Section 9; on the right of individuals to examine documents and observe the deliberations of public bodies or agencies at all levels of government under Article II, Section 9; and on an independent judiciary committed to supporting, protecting, and defending this constitutional scheme.

---

[5] Leslie Cauley, *NSA has massive database of Americans' phone calls*, USA Today (May 11, 2006).

[6] Josh Meyer & Greg Miller, *U.S. Secretly Tracks Global Bank Data*, L.A. Times A1 (June 23, 2006).

[7] *American Civil Liberties Union v. National Sec. Agency*, ____ F. Supp. 2d ____, 2006 WL 2371463, 2006 U.S. Dist. LEXIS 57338 (E.D. Mich. 2006).

¶45 It was prescient of the framers of Montana's Constitution to recognize that the right of individual privacy may well depend upon the right to know. And it was their farsightedness which requires that the scales—holding on one side privacy and on the other disclosure—be tipped in favor of the right to know, *except* where the demand for individual privacy *clearly exceeds* the merits of public disclosure. In cases brought under Article II, Section 9, the right to know is superior and disclosure is presumed.

¶46 From this presumption, it follows that public officers and bureaucrats do not own proprietary interests in public documents and information; they do not have the right to censor public documents and information; they do not have the right to close off the government's deliberations from public scrutiny no matter how well-meaning or solicitous their intentions—with one, and only one, explicit constitutional *exception*: cases in which the demand of individual privacy *clearly exceeds* the merits of public disclosure.

¶47 Yet that is what is happening in Montana in too many instances. As the freedom of information audit conducted in the summer of 2003 by various news organizations[8] demonstrated, requests of officials for specific public documents were met, on average, only 81 percent of the time. And in only 19 of 56 counties were all of the requested documents supplied. While some local government officials, when asked for public information, were willing, polite, and cheerful, others were rude, hostile, defensive, antagonistic, and parochial

---

[8] *See* Bob Anez, *Review shows frequent violations of open records laws*, Billings Gazette (Oct. 22, 2003), and Gazette Staff, *Public records audit shows mixed results*, Billings Gazette (Oct. 22, 2003).

and demanded information regarding the identity of the requestor. In one case, the public official censored public information that "the public [didn't] need to know about."

¶48    Discussing this survey, Montana School of Law Professor Fritz Snyder recounts:

> In 2003, a survey in Montana showed an 81 percent success rate in obtaining public information from public agencies. However, nearly half of Montana's county sheriffs violated the state's Open Records Law by refusing to release their jail rosters. The sheriffs or their employees claimed the inmate lists were confidential. The Daniels County sheriff said he did not care what the law said: "He wasn't about to let anyone see his list of recent crime calls without a court order." "A District Court clerk in Chinook took it upon herself to censor the roster of court cases by removing ones 'the public doesn't need to know about.'" In six counties, officials said it would take a court order to get the information. "In all, just 11 counties provided the reports at the first request from the citizens making the checks." Judith Basin County Sheriff Robert Jacobi said that his office "has a responsibility not to disclose the misfortunes of people in the community to anyone who walks in off the street."

Fritz Snyder, *The Right to Participate and the Right to Know in Montana,* 66 Mont. L. Rev. 297, 317-18 (Summer 2005). (Among the items requested was a copy of each sheriff's report of the incident calls handled in the previous twenty-four hours.)[9]

¶49    The Montana Constitution has been the supreme law of this State for more than thirty years. It is wholly unacceptable that the media and public are still met with intransigence, stalling tactics, and delay, and are ultimately forced to litigate to obtain public documents to which they are constitutionally—and presumptively—entitled. We see far too many of these cases each year; and there are more waiting in the wings as we hand down this Opinion.

---

[9] Further study of the Freedom of Information Act survey to which Professor Snyder refers can be made at the Montana Associated Press website: http://www.ap.org/montana/MTFOI.html (last visited September 1, 2006). *See also* http://foi.missouri.edu/openrecseries/mt/countycompliance.html (last visited September 1, 2006).

22

¶50 While awarding attorney fees is, as noted, discretionary, the sorts of abuses at issue in this case will continue *ad infinitum* unless the custodians of public documents appreciate that violations of the right-to-know provisions of the Constitution will, in the usual course, result in an award of attorney fees in favor of the requestor and against the local government. Adopting the above factors will guide the trial courts in that direction, and, therefore, I would adopt the same.

¶51 That said, the practicing bar must understand that this Court will avoid addressing these factors unless some litigant makes it an issue in the trial court. Therefore, I urge the media, or whichever citizen is next deprived of his or her fundamental right to know, to make these factors an issue in any demand for attorney fees and to raise the lower court's denial of the use of these factors in the opening brief on appeal. Presumably, since this matter is being remanded for reconsideration of the attorney fees question—a decision that, itself, will be appealable—the Gazette will do precisely that.

¶52 With that addition, I concur in our Opinion.

/S/ JAMES C. NELSON

Justice Patricia O. Cotter concurs.

¶53    As author of this Opinion, I write separately to express my agreement with Justice Nelson's analysis of the factors that should be considered in determining whether to grant attorney fees in right to know cases, and with the views he expresses in ¶¶ 37-42 of his concurrence.

/S/ PATRICIA COTTER

Chief Justice Karla M. Gray, concurring in part and dissenting in part.

¶54    I concur in the Court's opinion on issue one and its holding that the public—here, represented by the Gazette—has a right to inspect the entirety of the deposition at issue with names of the non-parties redacted.  I also join the Court in concluding the District Court abused its discretion by failing to state a rationale for denying the Gazette's motion for attorney fees and its remand for that purpose.  Our precedent compels this result.

¶55    I respectfully dissent from much of the Court's discussion of issue two relating to attorney fees.  In addition, I feel compelled to comment on the concurring Justice's views.

¶56    To begin near the end of the Court's opinion, the Court makes an actual holding that discretion to deny attorney fees in right to know cases is "not unfettered."  A "holding" is a "court's determination of a matter of law pivotal to its decision[.]"  *See* 749 BLACK'S LAW DICTIONARY (8th ed. 2004).  Here, no party suggests—and nor would a party to any other case in Montana suggest—that judicial discretion is unfettered.  In my view, the law is

24

abundantly clear that discretion is not unfettered. Thus, the Court's "holding" to that effect is not a determination of a matter of law, much less a matter of law "pivotal" to its decision on attorney fees in the present case.

¶57 We all agree that the language of § 2-3-221, MCA, vests discretion in a district court. Moreover, our longstanding and ineluctable rule is that a trial court abuses its discretion when it "acts arbitrarily without conscientious judgment or exceeds the bounds of reason resulting in substantial injustice." *Campbell v. Canty*, 1998 MT 278, ¶ 35, 291 Mont. 398, ¶ 35, 969 P.2d 268, ¶ 35; s*ee also*, *Shilhanek v. D-2 Trucking, Inc.*, 2000 MT 16, ¶ 24, 298 Mont. 101, ¶ 24, 994 P.2d 1105, ¶ 24; *Matter of Investigative Records*, 272 Mont. at 488, 901 P.2d at 567. Stated simply, this means that an exercise of judicial discretion requires non-arbitrary, conscientious judgment. It clearly does not mean—and has never meant—that discretion is unfettered.

¶58 Furthermore, it is not easy—and is not intended to be easy—for a party to establish an abuse of discretion on appeal. However, it can be done—and is not uncommonly done—by appellants in this Court. *See*, *e.g.*, *State v. Golie*, 2006 MT 91, ¶ 30, 332 Mont. 69, ¶ 30, 134 P.3d 95, ¶ 30; *Somont Oil Co. v. A & G Drilling, Inc.*, 2006 MT 90, ¶¶ 23, 28, 332 Mont. 56, ¶¶ 23, 28, 137 P.3d 536, ¶¶ 23, 28. As stated above, no "holding" that discretion is not unfettered is necessary here, or in any other case. Holdings by this Court should continue to be used only for pivotal determinations of legal matters.

¶59 Moreover, I do not understand the Court's reasons for even mentioning *Associated Press, Inc.* in discussing attorney fees in the present case. From our numerous cases on the

attorney fee issue in right to know versus right to privacy cases, it appears to me the Court references one that is substantially dissimilar. It is true that in *Associated Press, Inc.*, we held that the costs of litigation in cases where public benefits were gained should be spread among beneficiaries. We so held, however, in the context of an action by AP successfully challenging a Department of Revenue regulation we held was facially unconstitutional, and the very promulgation of which was egregious conduct by a state agency. I agreed with our decision on attorney fees there and continue to support it.

¶60     The case now before us bears little resemblance to *Associated Press, Inc.* Here, the County—not the Gazette—began the underlying action. Recognizing its obligations pursuant to the constitutional right to know as well as its employees' asserted constitutional rights to privacy, it is my view the County did the best it could: it filed for a District Court declaration regarding the competing constitutional rights within two weeks of the Gazette's initial request (which, importantly, did not yet include a request for the Bevolden deposition which later became—and still is on appeal—a primary focal point of the Gazette's interest). In doing so, the County asked a court to balance the competing constitutional rights as discussed in the Court's opinion on issue one.

¶61     What were the County's other options? It could have simply ignored privacy rights and provided the information to the Gazette. Surely this Court does not want to encourage a government entity to do so. In any event, the potential result of that choice by the County would be litigation asserting a violation of its employees' privacy rights. Alternatively, the County could have told the Gazette "the heck with the right to know." Surely we do not

want to encourage that conduct either, with the relatively certain result of litigation *by* the Gazette asserting a violation of the constitutional right to know, which properly would be more susceptible to an award of attorney fees pursuant to *Associated Press, Inc*. It is my view that the County took the only reasonable approach by presenting the matter to a judge whose job it is to resolve such sensitive constitutional balancing issues.

¶62    At the bottom line, I note that we—and others—often cite to the discretion vested in a trial court pursuant to § 2-3-221, MCA. We often overlook, however, the remainder of that statute which states without equivocation that "[a] plaintiff who prevails in an action brought in district court to enforce his rights under Article II, section 9, of the Montana constitution may be awarded his costs and reasonable attorneys' fees." Here, the Gazette was not a plaintiff trying to enforce rights under Article II, section 9; the County was the plaintiff in the District Court. Consequently, it is my view that—ultimately—the Gazette cannot be awarded attorney fees in this case.

¶63    With regard to the concurring Justice's opinion, I fully understand the decision to put the Gazette's late-offered "guidelines" out in plain view. We often include matters not timely or properly raised in a case before us in concurring opinions to "get them out there" as food for thought or for legal argument in future cases. Moreover, while some might question the propriety of giving advice to the Gazette's lawyer (who, it safely can be said, does not need it!) about a position to take on remand, these are matters wholly within the judgment, conscience and discretion of each of us. For myself, I have no quarrel with the idea that district courts may—in an appropriate case—consider such factors, together with any other

27

factors offered by parties or deemed appropriate by the court in cases such as these. I would not, however, support an effort to mandate consideration by district courts of these or any other factors in the exercise of their discretion under § 2-3-221, MCA.

¶64 Furthermore, I observe that the lengthy discussion of Article II, Sections 8 and 9, of the Montana Constitution and other matters—in ¶¶ 36–48 of the concurring opinion—springs entirely from the concurring Justice's view that "a presumption of awarding attorney fees to the prevailing plaintiff" should exist in cases of this type. It is important to note that the Gazette does not raise this theory. In addition, at least in my view, the discussion in support of the "presumption" appears to place the concurring Justice somewhat at odds with the Court's—and my—continued support of the critical balancing test in right to know and right to privacy cases, as discussed by the Court in issue one. Finally, the presumption—even as expressed by the concurring Justice—would apply to a "prevailing plaintiff." In any event, however, this latter portion of the concurring Justice's theory is consistent with the language of § 2-3-221, MCA, as discussed above, and would bar an award of attorney fees to the Gazette in the present case.

¶65 In sum, I concur in the Court's opinion on issue one. I dissent from much of the Court's rationale in discussing issue two and would simply, without fanfare, remand to the District Court for the entry of an order stating the reasons it denied the Gazette's motion for attorney fees pursuant to § 2-3-221, MCA. I dissent from the Court's failure to do so.

/S/ KARLA M. GRAY